# UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MARYLAND
## GREENBELT DIVISION

| | |
|---|---|
| _____ ) | |
| In re MARIA L. MEJIA, ) | |
| ) | Chapter 7 |
| Debtor ) | Case No.: 12-12090 |
| _____) | Hon. Thomas J. Catliota |
| ) | |
| MARIA L. MEJIA, ) | |
| 262 W. Deer Park Road ) | |
| Gaithersburg, MD ) | |
| ) | |
| Plaintiff ) | |
| ) | |
| v. ) | Adv. Proc. No. _____ |
| ) | |
| PARTNERS FOR PAYMENT ) | |
| RELIEF, PARTNERS FOR PAYMENT ) | |
| RELIEF DE III LLC and DAVID ) | |
| VAN HORN, ) | |
| 3748 West Chester Pike, Suite 103 ) | |
| Newtown Square, PA 19073` ) | |
| ) | |
| Defendants ) | |
| _____) | |

## COMPLAINT FOR CONTEMPT SANCTIONS
## UNDER SECTIONS 105(a) AND 524(a) OF THE BANKRUPTCY CODE

Debtor Maria L. Mejia (the "Debtor" or "Mejia"), through the undersigned counsel,

brings this adversary proceeding against Partners for Payment Relief and Partners For Payment

Relief DE III LLC (collectively, "PPR") and David Van Horn, individually and as president of

PPR (collectively, "Defendants") pursuant to Sections 105(a) and 524(a) of the United States

Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.* (the Bankruptcy Code") and Rules 7001-70 of the

Bankruptcy Rules of Procedure to obtain a determination that Defendants are in contempt of

1

court for violation of Section 524(a) of the Bankruptcy Code by attempting to collect a debt

discharged in the Chapter 7 case as a personal liability of the Debtor.

In further support of this Complaint, the Debtor alleges as follows:

## I.     JURISDICTION

1.      This Court has jurisdiction over this motion under 28 U.S.C. §§ 157 and 1334.

This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

2.      The statutory predicates for the Debtor's complaint are Sections 105(a), 524(a)

and 727 of the Bankruptcy Code.  This adversary proceeding is authorized by Rules 7001-70 of

the Bankruptcy Rules of Procedure.

## II.     FACTUAL BACKGROUND

### A.     The Parties to this Adversary Proceeding

3.      **Maria L. Mejia**.  Mejia, a resident of Maryland, was born in El Salvador in 1963,

and immigrated to the United States in 1985 as a political refugee after her first husband was

murdered in the civil war in El Salvador.  Mejia, who has only a sixth grade education that she

obtained in El Salvador, has limited skills in conversational English and no meaningful ability to

read or write in English.  She is self-employed as a housekeeper.

4.      In September 2005, Mejia purchased a small, attached single family home at 262

W. Deer Park Road, Gaithersburg, Maryland, for $284,000.  Through her work as a housekeeper,

Mejia had accumulated $28,000 in savings that she put toward the purchase price and roughly

$13,000 in closing costs.  She financed the remainder of the sale price through two "sub-prime"

mortgages—a first mortgage with Countrywide Home Loans ("Countrywide") and a second

mortgage with Intervale Mortgage Corporation ("Intervale") in the amount of $49,650.  In effect,

therefore, Mejia was allowed to purchase the home with five percent down despite the unpredictability of her income cleaning homes.

5.      Like millions of other Americans, Mejia fell victim to the recession that began in 2008.  The value of her home, which she purchased at the height of the market, has since fallen by thirty percent or more.  At the same time, her income fell substantially during the recession because many of her clients became unable to afford housekeeping services.  As a result, Mejia was unable to make payments on the two loans.  In 2012, facing the potential loss of her home, Mejia filed the captioned Chapter 7 petition discussed below.

6.      **Partners for Payment Relief.**  While the name Partners for Payment Relief implies that PPR is some form of consumer assistance agency, PPR is, in fact, a profit-making corporation that was formed by a former realtor, David Van Horn in 2007, to take advantage of the mortgage crisis.  PPR maintains two websites—pprnoteco.com, which explains the business model and is designed to encourage individuals to invest in the business or to buy a note from PPR, and partnersforpaymentrelief.com, a website that appears to be aimed at homeowners who PPR has contacted with regard to making payments on the non-performing second mortgages it has purchased.

7.      PPR describes the non-performing second mortgages it purchases as "toxic assets."  According to the investor website, if the first mortgage is greater than the value of the property and the homeowner has quit making payments on the second, PPR is able to purchase the notes at discounts as low as two or three cents on the dollar.  PPR is able to turn these notes into what it calls "performing assets" by threatening or implementing foreclosure proceedings because even though foreclosure produces no value, PPR can use the threat of foreclosure or

eviction following foreclosure to coerce the homeowner into making payments on the second mortgage.

8.      On pprnoteco.com, PPR openly describes "how it works" and offers "training" for those "investors" to whom it seeks to sell notes that PPR has already purchased (at a small profit, of course, compared to what PPR paid).  *Id*.  Under PPR's motto, "it pays to keep people in their homes," PPR states that "[o]ur business philosophy is simple: we work with the homeowner to develop a strategy that enables them to keep their home."  What this means, in practice, is that PPR knows that the notes it purchases have no value as a security interest, and its strategy, therefore, is to obtain a "workout agreement" under which the homeowner makes payments to PPR.   While PPR claims that it works with homeowners in a "respectful, compassionate way," the strategy it describes is Debt Collection 101, all focused on the ultimate threat of foreclosure if the homeowner will not agree to pay:  (1) a "mail campaign," that includes sending an FTC Fact Sheet "that explains what Foreclosure is as defined by the government, giving the homeowner some perspective of what the process entails and it's all coming from a verified third party;" (2) a "phone campaign," in which "[w]e usually call every 2 or 3 days;" (3) a "Door Knock Service and P.I.," in which if the homeowner answers then the private investigator "hands them a cell phone with PPR's asset manager on the other line," something that is "pretty big psychologically" in showing that PPR is serious about its threats; and (4) a "legal campaign," in which after two or three weeks "we continue our other campaigns while simultaneously initiating foreclosure."

9.      With regard to the "legal campaign," PPR states that "[w]e do this by contacting the proper attorney and having them send out a Demand Letter," noting that it pays the attorney for sending the demand letter "PRIOR to sending in a retainer because the demand letter itself

can oftentimes be enough for the borrower to respond."  PPR waits 30 days after the demand

letter is sent for "the attorney [to] go to the courthouse to file in the public record for

foreclosure," noting that "setting the foreclosure sale date and having a notice for the hearing and

the notice of sale date are both triggers for borrowers to realize foreclosure will happen without a

dialogue with the current note owner."  According to PPR, "[p]utting a sale sign on the front

lawn or having the sheriff put an ejectment notice on the door has also been really powerful in

getting the borrower to understand that, first, we can foreclose (yes, even from the 2nd position),

but mostly that we're willing to create a win-win solution," the latter being a euphemism for a

workout agreement in which the homeowner agrees to assume personal liability for payment.

       10.     On the investor website, Van Horn states that "the 'shock and awe' impact of this

quickly executed series of touches with the borrower shows a sense of urgency that their

situation has escalated to a level of seriousness that they are going to have to address or

foreclosure WILL be inevitable."  Homeowners are willing to pay PPR under these

circumstances, Van Horn explains, because "emotional equity" in the home "still gives the

upside down lien some value."  What Van Horn calls "emotional equity," however, may be "the

emotions that come into play when they love their home, have kids still in school, and aren't

looking to leave" but in many cases is economic coercion created by PPR's initiation of

foreclosure proceedings:  "They stay there because it's cheaper than moving and finding a new

home to rent where they would have to come up with first month, last month, and a month

security all with questionable credit."

       11.     In the investor website, Van Horn freely admits that PPR does not initiate

foreclosure to obtain title to the property but, rather, to force the homeowner to enter into a

workout agreement:

> This final point is really important to understand. In a situation where a borrower has gone months or years without paying a note, it can take a powerful trigger to get them to take action, and that's the main purpose behind the legal actions. Sometimes it just takes the reality of a foreclosure notice to get someone to engage with one of our workout specialists. Now, do we ever actually foreclose? Yes, but not that often. It varies from trade to trade, but on average we only initiate foreclosure on about 50% of all the loans we buy, and of that 50% we only foreclose on less than 10%. <u>Above all we use legal as a tool for getting through to the borrower, and at the end of the day, everything we do is focused on keeping someone in his or her home.</u> We find that these favorable workouts are what create the most profit on our end and there's [sic].

In other articles, PPR describes foreclosure as a "last resort" or an "exit strategy," noting that "you can exit the loan through the property or through the homeowner" but it "is usually always better through the homeowner" and "[y]ou can even work things out with the borrower after foreclosure in some cases," statements that plainly demonstrate "[t]he absence of any other reason for a creditor's act other than coercion."

12.    In carrying out this scheme, PPR makes a number of inaccurate or misleading assertions in the "FAQ" portion of its consumer website designed to frighten homeowners into paying PPR the full amount of the note. These include assertions (1) that even if the homeowner filed for bankruptcy "[i]f you want to stay in the property, the property's debt must be paid;" (2) that even if the homeowner is current on the first mortgage PPR, "can foreclose from any secured lien position, without paying off the first mortgage at time of foreclosure, regardless of the value of the house;" (3) that "[f]iling bankruptcy may release you personally from the obligation of paying the loan; however, the loan is still a secured lien against the property, in order to stay in the property all secured liens must be paid regardless of secured lien position;" (4) that PPR can "pursue [the homeowner] for a deficiency judgment" in "most states;" and (5) that "the advantages of avoiding a foreclosure" are that "[y]our credit score will rebound faster, you can control the outcome using your plan instead of the lender's plan."

13.     The FAQs also contain several "answers" to frequently asked questions that are, at a minimum, seriously misleading with regard to the effect of a bankruptcy filing. These include:

> <u>I filed bankruptcy, so I didn't think I was responsible for this loan any more. Is this true?</u>
>
> If you want to stay in the property, the property's debt must be paid.
>
> <u>What happens if I file bankruptcy?</u>
>
> Filing bankruptcy may release you personally from the obligation of paying the loan; however, the loan is still a secured lien against the property, in order to stay in the property all secured liens must be paid regardless of secured lien position. In addition any fees associated with bankruptcy will be added to the payoff amount you owe.
>
> <u>Can the lender pursue me for a deficiency judgment?</u>
>
> Yes, in most states.

Anyone who read and believed these statements would conclude (1) that the Bankruptcy Code obligated the debtor to pay the entire secured debt on the property, plus additional costs due to the bankruptcy filing; (2) that the homeowner was legally obligated to pay PPR on the underlying debt to stay in their home even though the debt had been discharged in bankruptcy; and (3) that PPR could pursue them for a deficiency judgment "in most states." Such misrepresentations are part of PPR's strategy of coercing homeowners to pay a discharged debt as a personal liability. Moreover, there is nothing on the consumer website, unlike its investor website, which discloses that PPR was not a representative of the original lender but, rather, purchased the second mortgage at a substantial discount.

14.     Even if PPR actually has an enforceable security interest in the property (which, as explained below, is in dispute in the present matter), the act of foreclosing under these

circumstances is not a good faith exercise of that security interest because foreclosing on a second mortgage and purchasing the property where the amounts due on the first mortgage exceed the value of the property does not give PPR marketable title to the property.  Rather, the entire business model is premised on the threat of foreclosure being sufficient at some point to force the individual to make payments to PPR.  The only thing of "value" that PPR achieves through foreclosure is to obtain an order of eviction on short notice that it can use to extort payments from the homeowner (even where, as here, the underlying debt has been discharged in bankruptcy).

15.     PPR appears to have been very successful from a financial perspective.  According to the investor website, Van Horn began the business during the foreclosure crisis in 2007 by purchasing a handful of second mortgages and has since turned it into a "half billion dollar" business that directly employs more than twenty employees and maintains a group of twenty-two law firms on retainer around the nation to initiate the foreclosures that are so essential to the business model.

**B.     Mejia's Petition Under Chapter 7 and Order of Discharge in 2012**

16.     On February 8, 2012, Mejia filed the captioned petition for bankruptcy under Chapter 7 of the Bankruptcy Code.  She was represented in that proceeding by attorney Joseph Trevino of Greenbelt, Maryland.  In Schedule D to the Chapter 7 petition, Mejia listed her residence as having a value of $183,600 subject to mortgages by BAC Home Loans Servicing LP in the amount of $281,254, and PPR in the amount of $48,912.  Under the column "unsecured portion, if any," Mejia listed the entire debt to PPR as "unsecured."  *Id.*  PPR was provided notice of the filing, but it did not file any claim or file any objections to the statement that the entire amount owed PPR was an unsecured debt.

17.    Mejia also filed a Chapter 7 Individual Debtor's Statement of Intention.  In that document, she stated her intention (a) that she "retain" the property and "affirm" the debt to BAC Home Loans Servicing, LP; and (b) that she "surrender" the property subject to the second mortgage held by PPR.  She also indicated with regard to both creditors that the property was "exempt."  PPR did not file any objections to these statements.

18.    On May 16, 2012, the Bankruptcy Court issued an Order "that the Debtor is granted a discharge under Section 727" of the Bankruptcy Code.  PPR did not appeal or otherwise object to the Order.

19.    Mejia's sole purpose in filing for bankruptcy was to save her home even though the amount due on first mortgage is substantially higher than the market value of the home and was told by her bankruptcy attorney that the order of discharge in her Chapter 7 case eliminated her liability under the second mortgage.  Mejia had no understanding of PPR's efforts to contact her until March 2013, when she recalls receiving something in the mail but she did not understand what the document was and sent it to her former attorney, who told her that she did not need to worry about the debt because it was discharged in bankruptcy.  It was not until the sheriff showed up on her doorstep with an order of eviction in July that Mejia actually realized that PPR had foreclosed on her home.

**B.    PPR's Foreclosure and Sale of Mejia's Home.**

20.    On December 19, 2012, PPR filed a Notice of Foreclosure Action in the Circuit Court for Montgomery County, Maryland.  The fact that PPR's purpose in initiating the foreclosure action was to collect from Mejia personally is clearly demonstrated by one of the documents filed by PPR, a "Final Loss Mitigation Affidavit" signed by Kathleen Dougherty, identified as a PPR "workout specialist," on December 12, 2012.  In that document, she states

9

that "I made numerous attempts on behalf of my employer, Partners for Payment Relief, the

lender, to go over borrower's options to satisfy this debt. I began mailing letters on 10-24-11 and

made numerous phone calls [un]til present (this is one year and 1 month).  Borrower never

attempted to contact Partners for Payment Relief."  During the 13-month period to which she

refers, Mejia filed her Chapter 7 petition and obtained an Order of Discharge.  While PPR was

plainly aware of the bankruptcy filing and order, there is nothing in Dougherty's statement to

indicate that PPR communicated that to her, as the "workout specialist," that the debt had been

discharged in bankruptcy or that PPR treated Mejia's situation any differently than other

collection efforts.

21.     Under Maryland law, PPR was required to provide personal service of the

documents on Mejia.  Maryland Code Ann., Real Property § 7-105.1(h).  On January 9, 2013,

PPR filed an Affidavit of Service of Process by Abode Service upon which PPR relied in

obtaining the foreclosure.  That affidavit states that service was made at Mejia's home on

January 7, 2013, on "Marcello Mejia, a Hispanic male, 6', 230 lbs., approximately 35 years of

age" who identified himself as "co-tenant" with Mejia.  There is not, and never has been, anyone

named Marcello Mejia who resided at Mejia's home nor does she even know anyone by that

name.  There were two Hispanic males living in the home at the time, neither of whom is named

Marcello Mejia and, other than being Hispanic, neither of whom remotely fits the description of

the personally alleged served.   Mejia's husband, Ricardo Alberto Padilla, has both a different

first and last name.  Padilla was fifty years old on January 7, 2013, not thirty-five, and weighed

at least 280 pounds.  Mejia's son, Ricardo ("Ricky") Alberto Mejia, was twenty years old on

January 7, 2013, not thirty-five, and weighed more than 300 pounds.  The only other males with

the last name Mejia who Ms. Mejia knows that live in the United States are her brothers, none of

10

whom is named Marcello and none of whom lived at, or even had a key to, her house.  In fact, Ms. Mejia never received the Notice of Foreclosure Action advising her of her rights.

22.    Whether property is occupied by the owner has significant implications in the required foreclosure process under Maryland law.  See Maryland Code Ann., Real Property, § 7-105.  The Notice of Foreclosure Action filed on December 19, 2012, states in bold type:  **"The Property which is the subject of the captioned foreclosure action is non owner occupied residential property."**  In fact, Mejia had occupied the property continuously since 2009, and PPR had no good faith basis for asserting otherwise.  The information upon which PPR and Diamond purportedly relied in making the representation that the property was not owner occupied were two "field reports" made in late 2011—that is, more than a year earlier—and which stated (incorrectly) that the property was vacant at that time.  Both PPR and attorney Diamond received notice of the bankruptcy proceeding during 2012 in which the papers clearly identified the property as Mejia's home address and further claimed a homestead exemption that would only apply if the home were her residence.  Moreover, the Affidavit of Service of Process that PPR filed with the Court on January 9, 2013, states that the property at issue was Mejia's "confirmed address" and the process server gave the papers to an individual named Marcello Mejia who identified himself as a "co-tenant with [Mejia]," indicating that PPR and Diamond actually believed that Mejia lived at the residence while it simultaneously told the court that the property was not owner occupied.

23.    On February 11, 2013, according to the court file, Diamond sent Mejia a letter via certified mail giving notice of a foreclosure sale of Mejia's residence by public auction on February 27, 2013.  At the bottom of this letter, Diamond included in bold type the statement:

11

**"PLEASE BE ADVISED THAT THIS IS AN ATTEMPT TO COLLECT A DEBT.  ANY INFORMATION OBTAINED WILL BE USED FOR THAT PURPOSE."**

24.     On February 27, 2013, PPR, with Diamond acting on its behalf, conducted an "auction" of Mejia's residence on the Courthouse steps of the Circuit Court for Montgomery County.  It seems that no one appeared for the auction other than Diamond, who "offered the property for sale" and then purchased it back on behalf of PPR.  On April 22, 2013, PPR obtained an order ratifying the sale and on May 6, 2013, PPR filed a motion asking the court to award possession of the property to PPR.  On June 24, 2013, the court issued an order of judgment of possession in favor of PPR.  On July 3, 2013, PPR obtained a writ of possession which was issued and delivered to the county sheriff on July 8, 2013.

25.     After the county sheriff appeared at her home with an order of eviction, Mejia sought the assistance of a friend who had been a lawyer to help her prepare an Emergency Motion to Stay Eviction and Set Aside Foreclosure, which Mejia on July 22, 2013, filed with the circuit court.  In response, Diamond on July 24, 2013, filed an opposition on behalf of PPR in which she acknowledged that PPR is barred by the Bankruptcy Code from pursuing Mejia personally to repay the second mortgage but asserted that this did not bar the foreclosure proceeding.  In that response, Diamond asserted that in light of the Chapter 7 discharge "PPR is merely prohibited from pursing the Defendant personally for any deficiency which exists following the foreclosure sale of the Property."  Mejia's motion to stay the eviction was denied.

**D.     PPR's Attempts to Collect the Discharged Debt Personally From Mejia**

26.     Following the notice of eviction, Mejia contacted Diamond in an effort to understand what had transpired and Diamond told her that the eviction would not occur until August 22, 2013.  Following this call, a representative of PPR who identified herself as Barb

12

Faust, "workout specialist," sent Mejia a hand-written note on PPR letterhead dated July 25, 2013, stating that she "had received a call from a third party who stated that you were interested in staying in your home and working something out regarding your second mortgage."  .

27.     In response to this letter, Mejia called Faust who agreed to have a Spanish-speaking representative call Mejia to explain the situation.  That representative, identified only as "Patricia," called Mejia on behalf of PPR and explained in Spanish that PPR would cease its efforts to evict her if Mejia would agree to pay $3,000 to PPR immediately and $471.25 per month over thirty years.  When Mejia said that she wanted to consult with an attorney, Patricia discouraged her from hiring a lawyer on the ground that Mejia would need the money to pay PPR and that Mejia could instead negotiate directly with PPR.

28.     On or about August 1, 2013, Mejia received via U.S. Priority Mail a four-page agreement that that obligated Mejia to pay the discharged debt personally.  While PPR was aware that Mejia did not speak English fluently, the proposed agreement was entirely in English except for a "post-it note," handwritten in Spanish, that asked Mejia to sign the agreement, have it notarized and return it to PPR with a copy of her driver's license.

29.     The agreement, written in legalese that Mejia would not have understood even if it were written in Spanish, provides that "under the limited circumstances contained herein PPR has agreed to change the term of the [Intervale] note."  The terms under which PPR agreed to change the note included a requirement that Mejia "hereby waives any claims or defenses to the foreclosure it has or may have had in consideration for PPR's agreement to enter into this Agreement," and that Mejia would pay PPR the sum of $78,600, purportedly representing the original amount of the second mortgage with Intervale plus accrued interest, plus interest at the

13

rate of six percent, with a payment of $3000 due immediately and $471.25 per month due for thirty years.

30.     While a person in Mejia's position would likely have understood that the agreement proffered by PPR would unwind the foreclosure, the proposed agreement did not do so.  Rather, the agreement provided that if Mejia made payments for eighteen months PPR would reconvey title to her.  It was written in such a manner, however, that if Mejia was late on even one payment PPR would have no obligation to reconvey title even if Mejia ultimately paid everything due under the agreement.

## III.    COMPLAINT FOR CONTEMPT SANCTIONS

**A.    Respondent's Efforts to Collect on the Promissory Note as a Personal Liability of the Debtor Violated Section 524(a) of the Bankruptcy Code.**

31.     Section 524(a) provides that "[a] discharge in a case under this title . . .  operates as an injunction against the commencement or continuation of an action, the employment of process, or an act, to collect, recover or offset any such debt as a personal liability of the debtor." While Section 524(a) does not expressly provide a remedy for a violation of the statutory injunction, the federal courts have uniformly held that bankruptcy courts have authority under Section 105(a) of the Bankruptcy Code to enforce Section 524(a) through contempt proceedings. *In re Paul*, 534 F.3d 1303, 1306 (10th Cir. 2008); *Walls v. Wells Fargo Bank, N.A.*, 276 F.3d 502, 506–07 (9th Cir. 2002); *Cox v. Zale Del., Inc.*, 239 F.3d 910, 916–17 (7th Cir. 2001); *Bessette v. Avco Fin. Servs., Inc.*, 230 F.3d 439, 444 (1st Cir. 2000); *In re Nat'l Gypsum Co.*, 118 F.3d 1056, 1063 (5th Cir. 1997); *In re Hardy*, 97 F.3d 1384, 1389 (11th Cir. 1996); *In re Malone*, No. 10-31855, 2012 WL 162374, at *6 (Bankr. W.D.N.C., Jan. 19, 2012); *In re Rountree*, 448 B.R. 389, 416 (Bankr. E.D. Va. 2011); *In re Kirkbride*, No. 08-00120-8-JRL, 2010 WL 4809334, at *3 (Bankr. E.D.N.C. Nov. 19, 2010); *In re Workma*n, 392 B.R. 189, 194

14

(Bankr. D.S.C. Nov. 21, 2007); *In re Cherry*, 247 B.R. 176, 186 (Bankr. E.D. Va. 2000); *In re Brantley*, 116 B.R. 443, 449–50 (Bankr. D. Md. 1990).

32.    The requirement under this body of case law for finding that the creditor is in contempt under Section 105(a) is that the violation of Section 524(a) was "willful," which the courts have defined to mean that (1) the creditor knew that the debt in question had been discharged in bankruptcy; and (2) the creditor intended the actions that violated the discharge injunction. *See, e.g.*, *In re Zilog, Inc.*, 450 F.3d 996, 1007 (9th Cir. 2006) (quoting *In re Bennett*, 298 F.3d 1059, 1069 (9th Cir. 2002)) (internal quotation marks omitted) (movant must prove that the creditor (1) knew the discharge injunction was applicable; and (2) intended the actions which violated the injunction"); *In re Hardy*, 97 F.3d 1384, 1390 (11th Cir. 1996) (the court will find the defendant in contempt if it: "(1) knew that the [discharge injunction] was invoked and (2) intended the actions which violated the [discharge injunction]").

33.    In the present case, the evidence establishes beyond dispute that PPR willfully violated the discharge injunction by attempting to collect the debt personally from Mejia.  PPR was plainly aware of Mejia's discharge under Chapter 7 because PPR was a creditor in that case and attorney Diamond was its counsel of record.  Diamond filed a pleading in state court on July 24, 2013, acknowledging that PPR was aware that the debt in question had been discharged in Chapter 7.  Despite this knowledge, PPR attempted to collect the debt personally from Mejia for more than a year, following the playbook that Van Horn outlined on the investor website and culminating with the proposed workout agreement that PPR sent after it had fully exercised its alleged rights *in rem*.

- Workout specialist Kathleen Dougherty admitted that she "made numerous attempts on behalf of [PPR] to go over borrower's options to satisfy this debt,"

albeit without success, through December 12, 2012, some 10 months after the discharge.

- PPR instructed Diamond to initiate foreclosure proceedings in December 2012 because, in Van Horn's words, "[s]ometimes it just takes the reality of a foreclosure notice to get someone to engage with one of our workout specialists."

- Diamond sent Mejia a letter on February 11, 2013, informing Mejia that PPR has scheduled a foreclosure sale on February 27, 2013, which stated in bold type: "PLEASE BE ADVISED THAT THIS IS AN ATTEMPT TO COLLECT A DEBT."

- Workout specialist Barb Foust sent Mejia a letter on July 25, 2013, offering to assist Mejia in "working something out regarding your second mortgage" so Mejia could "stay[] in your home."

- PPR Vice President John Sweeney on July 30, 2013, signed a proposed Agreement that purported to resolve Mejia's delinquent loan to PPR, and that document was sent to Mejia with a post-it note asking her to sign and return it to PPR.

34.    Congress intended the prohibition under Section 524(a) to be applied broadly to prohibit any effort to obtain payment from the debtor.

> The injunction is to give complete effect to the discharge and to eliminate any doubt concerning the effect of the discharge as a total prohibition on debt collection efforts. This paragraph ... cover[s] any act to collect, such as dunning by telephone or letter, or indirectly through friends, relatives, or employers, harassment, threats of repossession and the like.

S. Rep. No. 95-989, at 182-83 (1979).  Accordingly, the courts have interpreted the section to prohibit any action that has the purpose or effect of coercing the debtor into paying the debt.  *See generally* 4 COLLIER ON BANKRUPTCY ¶ 524.02 (15th ed. rev. 2005) (discharge injunction "extends to all forms of collection activity").

35.    The types of activity prohibited by Section 524(a) include express requests for payment, *e.g., In re Wallace*, No. 09-BK-594-PMG, 2011 WL 1335822, at *1 (Bankr. (M.D. Fla. April 5, 2011) (sending collection letter stating that "you owe a balance" on discharged mortgage debt); sending bills that list the discharged debt as due, *e.g., In re Riser*, 298 B.R. 469, 471

16

(Bankr. M.D. Fla. 2003) (bank repeatedly sent debtor mortgage statements that included discharged debt and failed to remove debt from records upon request); contacts with the debtor that are designed to persuade the debtor to make payment even if no request is actually made, *e.g., In re Malone*, No. 10-31855, 2012 WL 162374, at *7 (Bankr. W.D.N.C. Jan. 19, 2012) (attempted resumption of "personal friendship" violated discharge injunction when purpose was to collect discharged debt); and even no action "if the defendant's motive in failing to act was to collect the discharged debt," *In re Gunter*, 389 B.R. 67, 75 (Bankr. S.D. Ohio 2008).

36.    The courts have consistently rejected the argument that the existence of a security interest in the property justified the creditor's actions where the purpose or effect of the creditor's actions was to coerce the debtor into paying the debt personally.  *E.g.*, *In re Paul*, 534 F.3d 1303, 1308–09 (10th Cir. 2008) (ostensible attempt to collect debt *in rem* violates Section 524(a) where actions had no objective purpose except to coerce debtor to pay debt personally); *In re Pratt*, 462 F.3d 14, 19 (1st Cir. 2006) (refusal of creditor to release security interest on property that had no value violated Section 524(a) because action, when viewed objectively, would have the effect of coercing the Debtor into paying the debt violated Section 524(a)); *In re Harlan*, 402 B.R. 703, 715–16 (Bankr. W.D. Va. 2009) (rejecting creditor's argument that notices which contained disclaimer stating that "[i]f you received a bankruptcy discharge that included this debt, this notice is not intended and does not constitute an attempt to collect the debt against you personally" show "that the Debtors misconstrued their attempt to exercise only their *in rem* rights in the Debtors' Residence"); *In re Mooney*, 340 B.R. 351, 358–59 (Bankr. E.D. Tex. 2006) (existence of security interest on "manufactured home" not defense to creditor's repeated attempts to collect personally).

17

37.     Even if PPR's cramped view that the discharge injunction only prohibits the creditor from seeking a deficiency judgment were correct, PPR's rights would have been limited to obtaining possession of the property in a foreclosure proceeding and, by PPR counsel's own admission, it would have been unlawful to pursue Mejia for any payments after the foreclosure had occurred.  PPR cannot dispute, therefore, that its efforts to collect the debt from Mejia personally following the foreclosure by sending her a letter offering to "work something out" so she could "stay in her house," and tendering a proposed agreement that was explicitly based on the discharged debt, violated Section 524(a).  While the courts have held that the debtor need not produce a "smoking gun" to prove that the creditor's purported exercise of its in rem rights was an attempt to collect personally, *In re Lumb*, 401 B.R. 1, 7 (B.A.P. 1st Cir. 2009), in this case there are two "smoking guns" a letter on PPR letterhead offering to work something out so that Mejia could stay in her home, and a proposed agreement signed by a PPR vice president, both of which were sent after PPR had fully exercised its alleged rights *in rem* and, therefore, cannot be explained as anything other than an attempt to collect the debt personally from Mejia.

**B.     Respondent's Foreclosure on the Debtor's Residence Violated Section 524(a) of the Bankruptcy Code.**

38.     While a security interest in real property typically survives a Chapter 7 filing, in the present case the foreclosure itself violated Section 524(a) because it was not a legitimate exercise of its rights *in rem* but part of scheme to coerce Mejia into acknowledging personal liability for the debt.  "Violation of the discharge injunction does not require explicit demands for the repayment of a discharged debt."  *In re Malone*, No. 10-31855, 2012 WL 162374, at *5 (Bankr. W.D.N.C. Jan. 19, 2012).  Rather, as Judge Whitley held following a comprehensive survey of the case law, "a debtor may establish that a creditor who has taken an action not

overtly prohibited by § 524(a)(2) nevertheless violated the discharge injunction" where the creditor's actions were intended to coerce the debtor into paying the debt personally.  *Id.* (*quoting In re Paul*, 534 F.3d 1303, 1308 (10th Cir. 2008) (internal quotations omitted)).  Under this case law, even an otherwise permissible action such as foreclosing on a security interest that survived the bankruptcy violates Section 524(a) where the motive was to coerce the debtor into paying the debt.  In such a case, "[t]he absence of any other reason for a creditor's act other than coercion is circumstantial evidence of the creditor's motives."  *Id.  See also In re Paul*, 534 F.3d 1303, 1309 (10th Cir. 2008); *In re Pratt,* 462 F.3d 14, 20 (1st Cir. 2006); *In re Moore*, 407 B.R. 855, 861 (Bankr. E.D. Va. 2009); *In re Harlan*, 402 B.R. 703, 716 (Bankr. W.D. Va. 2009); *In re Schlichtmann*, 375 B.R. 41, 97 (Bankr. D. Mass. 2007).

39.    One could not find a more perfect example of these principles—nor a more compelling explanation of why they exist—than PPR's actions in the present case.  There was no legitimate business or financial reason for PPR to foreclose on Mejia's home because it knew that the market value of the home was far below what was due on the first mortgage.  Even if one had no understanding of PPR's business beyond Mejia's situation, PPR's motive to coerce Mejia into making payment personally is clearly demonstrated by the facts that (1) the property upon which PPR foreclosed had no value to PPR because it was purchased subject to a first mortgage that exceeded the fair market value of the property by at least $100,000; (2) PPR attempted on numerous occasions before instituting foreclosure to talk with Mejia to discuss her options for paying the debt; (3) PPR bought the property itself at auction because there were no other bidders; (4) PPR agreed to extend the original eviction date to August 22, 2013, so it could continue to pursue payment on the debt from Mejia individually; and (5) that PPR tendered an agreement to Mejia under which she would have assumed personal liability for the debt.

19

40.     PPR's goal of obtaining title so it could coerce Mejia to make monthly payments on the debt under threat of eviction is further demonstrated by the fact that PPR did not take any steps to maximize the purchase price from a third party.  Indeed, while state law requires that the auction be advertised in a newspaper of "general circulation" for three weeks prior to the auction, PPR purchased three small ads in the "Montgomery County Sentinel," a newspaper that counsel has never seen or heard of even though he has been a resident of Montgomery County for more than 15 years – ads that stated the property was being sold subject to the first mortgage but did not even give the amount of the mortgage, making it virtually certain that no one but PPR would bid.  As a result, PPR ensured that there would be no bidders other than PPR, allowing it to purchase the property and commence eviction proceedings.  In other words, the purported auction, which was the only way that PPR could recover anything based on its security interest in the property, was a complete sham, designed only to allow PPR to take legal possession of the property so that it could evict Mejia in an effort to coerce her into paying the debt personally.  More significantly, once the sale of the property was completed, PPR had no further rights *in rem*.  Everything done after that point was, by definition, an attempt to collect payment from Mejia personally.

41.     While no further evidence is needed to prove an intentional violation of Section 524(a), the evidence on PPR's investor website with regard to PPR's business model outlined above clearly demonstrate PPR's unlawful goal of attempting to collect the debt personally.  Whether this business strategy is lawful where the homeowner has not filed for bankruptcy will have to be determined in another forum.  Where the homeowner has filed for bankruptcy and obtained a discharge of the debt, however, PPR's actions are clearly unlawful.

42.    While foreclosing on Mejia's home for the purpose of coercing her into paying the debt personally would have violated the Bankruptcy Code even if the foreclosure had been properly executed, in assessing PPR's culpability one cannot ignore the misstatements that PPR attorney Diamond made to the court in order to obtain the foreclosure.  As explained above, the court file plainly discloses two provable falsehoods in documents that Diamond and PPR filed: (1) a proof of personal service that was allegedly made to a "co-tenant" named Marcello Mejia, someone who does not exist and whose physical description matches no one who lived at the residence; and (2) a representation that the property was not owner-occupied based on information that was a year old when PPR knew that Mejia had identified it as her residence in the bankruptcy petition.  One can fairly conclude that PPR did not care about the flaws in the foreclosure process because it was not trying to obtain marketable title but, instead, to create a credible threat it could evict Mejia and to coerce her into agreeing to pay PPR.

43.    Similarly, PPR and Diamond either were, or should have been, aware that if the foreclosure were challenged on the merits, PPR's right to foreclose could be challenged on at least four bases: (a) that Intervale (which was fined by the Office of Thrift Security in 2008 with "unsafe and unsound, deceptive [and] inconsistent" practices in making loans to borrowers "whose creditworthiness was not adequately considered" or "who have incurred large broker and/or lender fees") acted improperly in issuing the loan in the first instance, a defense that would have been available to Mejia because PPR purchased the note knowing that it was a "toxic asset" and, therefore, was not a holder in due course; (b) that PPR's ability to establish that it owned the note was questionable because the only evidence of which was a hand-written endorsement with no corporate seal and no identification of the office held by the person who signed it; (3) that PPR had no right to initiate the foreclosure process because the deed of trust

upon which it purported to proceed was recorded in the name of Mortgage Electronic

Registration Systems, Inc., or MERS, and PPR had nothing to indicate that MERS had

transferred or assigned to PPR the right to foreclose; and (d) that PPR's appointment of

Diamond, its attorney in bankruptcy and foreclosure proceedings, as "substitute trustee" under

the deed of trust under which PPR proceeded was (i) inconsistent with the terms of the deed of

trust because even if PPR could substitute trustees MERS remained the beneficiary; and (ii)

created a conflict of interest between Diamond's role as attorney for PPR and the trustee's

obligation to act in the best interests of all participants in the process.  See *D'Aoust v. Diamond*,

36 A.3d 941, 959 (Md. 2012) ("[a] trustee is bound for the protection of the interest of all the

parties concerned to bring the property into the market in such a manner as to obtain a fair

market price" and the "trustee not only represents the holder of the note secured by the deed of

trust, but also the owners of the property, who would be entitled to any surplus remaining after

the payment of expenses and the note secured by the deed of trust") (internal quotations and

citations omitted).

      44.     Diamond, in particular, should have been acutely aware of these risks because she

was the defendant in the *D'Aoust* decision, which was issued by the Maryland Court of Appeals

on January 31, 2012, only 11 days before Diamond sent notice of the foreclosure auction in

which she would serve as trustee.  In that case, , the Maryland Court of Appeals rejected her

argument that "judicial privilege" shielded her from lawsuit involving similar allegations that she

filed an inaccurate proof of personal service of the notice of foreclosure on the homeowner and

put the interests of her client above those of the homeowner.  In the present case, while the flaws

in the foreclosure process do not necessarily show intentional misconduct, they reinforce the

conclusion that PPR's foreclosure was not a good faith attempt to obtain marketable title to the

22

property but, as Van Horn explained on the website, a "tool" to persuade the homeowner to enter

into a "workout agreement."

**C.    The Debtor Is Entitled to an Award of Compensatory Damages for the Harm Caused by Respondents' Wrongful Conduct, Including Damages for Emotional Distress.**

45.    The case law cited above establishes that where the debtor is able to prove a

willful violation of Section 524(a), he or she is entitled to recover actual damages caused by the

creditor's unlawful conduct.  While the full extent of Mejia's damages cannot be determined at

this time because PPR's unlawful conduct is still ongoing, Mejia has lost substantial income in

the past months because of the time necessary to deal with this matter, look for another place to

live and pack her goods in anticipation that she could be evicted at any time.  The most

significant element of her actual damages, however, would be compensation for the enormous

emotional distress caused by PPR's actions.

46.    Several bankruptcy courts within the Fourth Circuit have concluded based on *In

re Walters*, 868 F.2d 665 (4th Cir. 1989), that emotional distress is not a compensable element of

damages within this circuit.  *E.g., In re Malone*, No. 10-31855, 2012 WL 162374, at *7 (Bankr.

W.D.N.C. Jan. 19, 2012) ("emotional distress damages are not available for discharge injunction

violations (or other civil contempt) in the Fourth Circuit").  The *Walters* case, however, involved

an order holding that an attorney was in contempt for refusing to comply with a court order to

repay to his client what the court concluded was an impermissible fee under the Bankruptcy

Code, and the only rationale of the decision was that "no authority is offered to support the

proposition that emotional distress is an appropriate item of damages for civil contempt, and we

know of none."  868 F.2d at 670.  In the twenty-four years since *Walters* was decided, however,

courts in various circuits have concluded that emotional distress damages may be awarded for a

23

violation of Section 524(a).  *See In re Torres*, 309 B.R. 643, 649 (1st Cir. B.A.P. 2004) ("The

conclusion of the Fourth Circuit in *Walters* was reached without critical analysis. . . . Often, as in

the case before us, a debtor's out-of-pocket expenses and other economic losses will be relatively

insignificant with respect to a violation of the discharge injunction.  In such instances redress for

sustained emotional injury would be a major factor in fashioning an award of full remedial

relief."), *rev'd*, 432 F.3d 20, 31 (1st Cir. 2005) (holding that sovereign immunity bars award of

emotional distress damages against federal government); *In re Dawson*, 390 F.3d 1139, 1150–51

(9th Cir. 2004); *In re Nibbelink*, 403 B.R. 113, 120–21 (Bankr. M.D. Fla. 2009); *In re

Manzanares*, 345 B.R. 773, 794 (Bankr. S.D. Fla. 2006); *In re Feldmeier*, 335 B.R. 807, 813–

814 (Bankr. D. Or. 2005); *In re Reno*, 299 B.R. 823, 828 (Bankr. N.D. Tex. 2003).

> 47.     If the *Walters* case were decided by the Fourth Circuit today, it could not rely on

the same rationale because there is substantial authority for an award of emotional distress

damages under Section 105(a) for a violation of Section 524(a).  The rationale for awarding

damages for emotional distress in enforcing the discharge injunction was persuasively explained

in a 2005 decision by Judge Clark of the Bankruptcy Court for the Western District of Texas.

> The whole premise of affording debtors a discharge in bankruptcy is to afford the
> honest debtor a fresh start.  A creditor who violates the discharge tramples on the
> promise Congress made to its citizenry.  Little wonder that emotional distress is
> (and ought to be) a significant component of damages for discharge violations.  A
> debtor who is promised a fresh start is hardly made whole by an order which
> simply repeats what the statutory injunction already says – stop all further efforts
> at collection activity.  A significant component of the fresh start is being free of
> the kinds of harassment, threats, and anxiety that debtors were suffering before
> they filed.  Threats and harassment are the first and most effective collection
> devices most creditors employ – far more prevalent and far more cost-effective
> than formal litigation.  These methods work precisely because they inflict
> emotional distress on debtors, at a sufficient level of pain to motivate debtors to
> pay money to the creditor to make the pain stop.  Outside of bankruptcy, inflicting
> that pain as a means of debt collection is legitimate (within the parameters of
> other legal limitations).  Once the debtor receives a discharge in bankruptcy,

> however, that particularly painful device for debt collection is supposed to stop.
> <u>When a creditor insists on continuing to inflict the same painful methods on a
> debtor in contempt of Congress' injunction, they must now compensate for the
> damages caused – and those damages are real.  Indeed, no one knows that better
> than the creditors themselves. They know they are inflicting pain, because they
> know that's what motivates debtors to pay them to make them go away.</u>

*In re Gervin*, 337 B.R. 854, 863-64 (Bankr. W.D. Tex. 2005) (emphasis added), *rev'd on other*

*grounds*, 300 Fed. App'x. 293 (5th Cir. 2008).  Given the factual distinctions between a

contempt order based on an attorney's failure to comply with a court order and an intentional and

egregious violation of Section 524(a), the express rationale of *Walters* that there was then no

authority for an award of emotional distress damages, and the widespread view among other

courts that such damages should be available, at least one recent Bankruptcy Court decision

within the Fourth Circuit concluded that the availability of emotional distress damages in the

Fourth Circuit was an open question.  *See In re Fina*, No. 1:12-cv-660, 2012 U.S. Dist. LEXIS

163855, at *30–31 (E.D. Va. Nov. 14, 2012) ("[w]hether pain and suffering and emotional

distress damages are recoverable in the Fourth Circuit for discharge injunction violations is

unclear").  Moreover, the present case does not involve the "garden variety" type of emotional

distress claim at issue in *Walters*, where the lower court awarded a token amount of $1000, but

extreme distress resulting in physical symptoms and medical treatment.  Accordingly, the Debtor

submits that the court should follow the weight of persuasive authority in this area rather than

rely on a twenty-four-year-old precedent that was based solely on the absence of such authority.

48.    The evidence would show that PPR's efforts unlawfully to collect a debt that

Mejia does not owe and could not pay upon threat of eviction have caused Mejia enormous

emotional distress, which is exactly what PPR intended.  Indeed, as explained above, Van Horn

concedes that the purpose of PPR's collection strategy, culminating with a foreclosure filing, was

to create "shock and awe," a military expression popularized in 1991 during Operation Desert Storm for "spectacular displays of force to paralyze an adversary's perception of the battlefield and destroy its will to fight adversary's perception of the battlefield and destroy its will to fight." Part of PPR's strategy is to coerce payments out of the homeowner's "emotional equity" and to put the homeowner in a position where it has little choice but to accept PPR's demands because even if they were willing to give up the home or move out would require that "they would have to come up with first month, last month, and a month security all with questionable credit."

49.     PPR's attempt to evict Mejia has had the intended effect.  Since PPR threatened to evict her and her family from their home, she suffers from near constant anxiety while at work during the day, worried that when she gets home she will find that the sheriff has moved her belongings onto the street, she has been unable to sleep at night, and she has developed sharp headaches and neck pain requiring medical care.  She has packed up her belongings in far that she and her family could be evicted at any time so she and her family are living amid boxes—a constant reminder that she is no longer safe in her home.  She is moving her bed into storage because she cannot bear to see it put out on the street, so she will have to sleep on the floor. Mejia's medical treatment has included a prescription of Valium for "anxiety/panic attacks" and a prescription of Buride, a diabetes medication, the stress has exacerbated Mejia's pre-existed diabetes.

50.     Mejia is terrified by the prospect of having nowhere to live.  She has attempted to look for apartments, but that process has compounded her anxiety and humiliation because she has to tell strangers that she is being evicted from her home and brace for their reaction—a devastating combination of disgust and pity.  Most landlords have told her that, with a foreclosure on her record, she is not eligible to rent.  One well-meaning landlord gave her the

number of a homeless shelter, which utterly humiliated her.  One of the few places where the landlord said he would even consider her, although with a large up-front payment that she cannot afford, is in an area where she feels unsafe, and where she would have to pass through groups of men gathered at the entrance drinking and partying at all hours.

51.     Mejia has had to deal with unimaginable tragedy in her life.  As a young woman during the civil war in El Salvador, she endured watching her first husband brutally murdered before her eyes.  She came to America to escape that brutality and embark on a new life where she not only supports herself, her husband and her son but she sends money home to her elderly mother and family in El Salvador.  Mejia has always been extraordinarily strong in the face of further adversity, including the murders of her father and brother in El Salvador after she came to the U.S., but nothing has caused her the level of distress that PPR's actions have because she now feels that her struggles and hard work in America have been for nothing.

52.     Ownership of the home means nothing to PPR because PPR's goal is to make money and the market value is roughly $100,000 less than what is due on the first mortgage.  On the other hand, home ownership means everything to Mejia.  Counting the $28,000 in savings that she used to buy the house – a $15,000 down payment and $13,000 in closing costs – and monthly payments for Bank of America over eight years, Mejia has invested more than $150,000 in the home.  If she is allowed to stay in the house and the housing market continues to recover, it is possible that in ten-to-fifteen years the house will be worth more than she owes.  If Mejia is evicted, on the other hand, the inevitable result would be a default on her loan to Bank of America, another foreclosure and, potentially, personal liability to Bank of America for a deficiency judgment, albeit a judgment that Mejia would be unable to pay.

27

**D.    The Debtor Is Entitled to an Award of Attorneys Fees and Costs Incurred in Bringing this Action.**

53.    The federal courts, including the Fourth Circuit, have held that a bankruptcy court has authority under Section 105(a) to award attorneys fees as a contempt sanction, *In re Walters*, 868 F.2d 665, 670 (4th Cir. 1989), and courts routinely award attorneys' fees as a compensable element of damages for a willful violation of Section 524(a).  *See In re Malone*, No. 1031855, WL 162374, at *7 (Bankr. W.D.N.C. Jan. 19, 2012; *In re Rountree*, 448 B.R. 389, 417 (Bankr. E.D. Va. 2011); *In re Kirkbride*, No. 08-00120-8-JRL, 2010 WL 4809334, at *5 (Bankr. E.D.N.C. Nov. 19, 2010); *In re Workman*, 392 B.R. 189, 195-196 (Bankr. D.S.C. 2007); *In re Cherry*, 247 B.R. 176, 187 (Bankr. E.D. Va. 2000).  Accordingly, following completion of proceedings in this matter, counsel will seek an award of fees incurred in the representation of Mejia.

**E.    The Court Should Award Punitive Damages Because Respondents' Conduct Was an Intentional, Egregious and Malicious Violation of the Bankruptcy Code.**

54.    The weight of authority, including a number of Bankruptcy Court decisions within the Fourth Circuit, is that punitive damages are available for a violation of the discharge injunction in proper cases.  *See In re Malone*, No. 10-31855, 2012 WL 162374, at *7 (Bankr. W.D.N.C. Jan. 19. 2012); *In re Rountree*, 448 B.R. 389, 417 (Bankr. E.D. Va. 2011); *In re Kirkbride*, No. 08-00120-8-JRL, 2010 WL 4809334, at *5 (Bankr. E.D.N.C. Nov. 19, 2010); *In re Adams*, No. 04-003875-5-SWH, 2010 WL 2721205, at *6 (Bankr. E.D.N.C. July 07, 2010); *In re Workman*, 392 B.R. 189, 196 (Bankr. D.S.C. 2007); *In re Evans*, 289 B.R. 813, 827 (Bankr. E.D. Va. 2002); *In re Cherry*, 247 B.R. 176, 186–90 (Bankr. E.D. Va. 2000).

55.     The potential standards for awarding punitive damages were outlined in a

comprehensive review of the issue by Judge Glenn of the Bankruptcy Court for the Middle

District of Florida:

> Some courts assess punitive damages based on a finding that the creditor
> acts with actual knowledge of the violation or with reckless disregard of
> the protected right. *See In re Wagner*, 74 B.R. 898, 903-04 (Bankr. E.D.
> Pa. 1987). ("[P]unitive damages are awarded in response to particularly
> egregious conduct for both punitive and deterrent purposes. Such awards
> are 'reserved ... for cases in which the defendant's conduct amounts to
> something more than a bare violation justifying compensatory damages or
> injunctive relief.'"). Decisions awarding punitive damages in this context
> typically consider the following factors: (1) the nature of the violator's
> conduct; (2) the nature and extent of the harm to the debtor; (3) the
> violator's ability to pay; (4) the motives of the violator; and (5) any
> provocation by the debtor. Other cases have assessed punitive damages
> where maliciousness or bad faith exists. Another standard assesses
> punitive damages "where an arrogant defiance of federal law is
> demonstrated."

*In re Wallace*, No. 09-bk-594-PMG, 2011 WL 1335822, at *7 (Bankr. M.D. Fla. April 5, 2011)

(internal quotations and citations omitted). In a similar review, Judge Somers of the Bankruptcy

Court for the Eastern District of Virginia concluded that "whether expressed as 'egregious

conduct,' 'malevolent intent,' or 'clear disregard of the bankruptcy laws,' each of these decisions

appear to employ a finding of creditor conduct beyond willfulness or deliberation and more

closely resembling a specific intent to violate the discharge injunction in order to assess punitive

damages." *In re Cherry*, 247 B.R. 176, 189 (Bankr. E.D. Va. 2000).

56.     In the present case, the precise formulation of the standard for punitive damages

does not matter because PPR's conduct exceeds any standard that could be articulated. PPR was

not trying to recover money it had loaned to Mejia (or any of the thousands of others upon which

it apparently has implemented the same scheme). PPR saw an opportunity at the height of the

mortgage crisis to make money out of the misery of others (and even better, as Van Horn brags

29

on his website, to do so by using "other people's money"). PPR's business, like that of the confidence man, preys on the weak and the ignorant and the fearful by intentionally subjecting them to what Van Horn proudly calls the "shock and awe" of an unanticipated foreclosure on their home. Even more important than the malicious nature of its business, however, is its arrogant defiance of the bankruptcy laws, best captured by Van Horn statement that Chapter 7 was not an impediment to collection on the loans because although "it is not the borrower's debt, it is the house's debt BUT if the borrower wants to stay in the house then they will have to pay off the debt. *Once you know this, you can then go back and start the foreclosure process; and if the borrower wants to stay in the property you're one step closer to a workout*."

57.    Counsel's review of the case law in which the courts have awarded punitive damages under Section 524(a) found nothing close to approaching PPR's conduct. *First,* unlike most creditors involved in other cases where the courts have awarded punitive damages, PPR did not loan Mejia money or provide other value that it is seeking to recover. To the contrary, PPR describes the second mortgages it purchased as "toxic assets" assets that the lenders want to get off their books because they have no value and Van Horn admits paying as little as two or three cents on the dollar for the most toxic of them. Since 2007, according to the investor website, Van Horn has turned this into a half-billion dollar business with more than twenty employees and some twenty-two law firms on retainer because of the legal risks involved in this activity. Given that PPR has made enormous profits based on a business model that clearly violates Section 524(a) when applied to discharged debts, a large award of punitive damages is necessary to deter this conduct in the future.

1.    *Second,* PPR knows that the loans it purchases are largely worthless except as a vehicle to coerce homeowners into paying money to PPR. While we have been unable to

determine what PPR actually paid for the Intervale note, it was likely the most toxic of all because the former Office of Thrift Supervision found in 2008 that Intervale had engaged in a pattern of "unsafe and unsound, deceptive [and] inconsistent" practices in making loans and required the company to establish a reserve account totaling $5 million to pay back borrowers "whose creditworthiness was not adequately considered" by Intervale or "who have incurred large broker and/or lender fees."  One of the reasons that the Intervale notes had little value was because any attempt to foreclose would be subject to the defense that Intervale, not the borrower, was at fault.  For example, given Mejia's self-employment as a housekeeper and her inability to put more than five percent down on the home, Intervale should have recognized that there were questions about her creditworthiness but it was willing to make the loan because of the annual interest rate, 9.69 percent, that she was willing to pay.  In other words, PPR knows or should know that the defaulted mortgages upon which its business is based have little, if any, value. Nonetheless PPR uses them to extract payments from homeowners under the threat of foreclosures that, likewise, would create no value for PPR.  As a matter of both bankruptcy policies and public policy generally, this is a "business" that should be deterred.

2.      ***Third,*** even if one ignores the fact that PPR sought to collect the debt personally in violation of the Bankruptcy Code, PPR's actions with regard to Mejia were unconscionable. Not only did PPR attempt to coerce her into making payments that she could not afford under threat of immediate eviction if she did not agree to its terms, PPR also discouraged her from talking with a lawyer and sent to her a proposed agreement in English even though PPR clearly knew that Mejia could not read English.  The act of attaching a "post-it note" to the agreement, handwritten in Spanish, asking Mejia to sign and return the agreement with no explanation in her

native language of the consequences if she did so was nothing short of fraud.  Such

unconscionable practices merit an award of punitive damages.

3.      **Fourth,** while this is not the appropriate forum in which to litigate the potential

claims against PPR under the Federal Fair Debt Collection Practices Act, 15 U.S.C. § 1692 *et*

*seq*., Maryland's Protection of Homeowners in Foreclosure Act, Maryland Code Ann., Real

Property § 7-301 *et seq*., Maryland Consumer Debt Collection Act, Maryland Code Ann., Com.

Law § 14-201 *et seq*., the court can see for itself that PPR's foreclosure and debt collection

practices raise serious questions about the legality of its conduct.  *See also Aribal v. GMAC*

*Mortgage, LLC*, No. 12-C-9735, 2013 WL 3895282, at *4 (N.D. Ill. July 29, 2013) (holding that

PPR was covered by Fair Debt Collection Practices Act, 15 U.S.C. § 1692 *et seq*., and denying

motion to dismiss in class action alleging that PPR's business violates statute).

4.      **Fifth,** PPR's violation of Section 524(a) was clearly a knowing and intentional

one.  PPR's knowledge that collection of debts discharged in bankruptcy was unlawful is

reflected in a disclaimer on PPR's consumer website, albeit in very small type.  The disclaimer

states:

> THIS COMMUNICATION IS FROM A DEBT COLLECTOR BUT DOES NOT
> IMPLY THAT PARTNERS FOR PAYMENT RELIEF IS ATTEMPTING TO
> COLLECT MONEY FROM ANYONE WHOSE DEBT HAS BEEN
> DISCHARGED PURSUANT TO (OR WHO IS UNDER THE PROTECTION
> OF) THE BANKRUPTCY LAWS OF THE UNITED STATES; IN SUCH
> INSTANCES, IT IS INTENDED SOLELY FOR INFORMATIONAL
> PURPOSES AND DOES NOT CONSTITUTE A DEMAND FOR PAYMENT.

Despite PPR's awareness that collecting debts that had been discharged in bankruptcy was

unlawful, PPR did so anyway.  As mentioned above, Van Horn acknowledged in an article on

the risks of buying non-performing notes that bankruptcy filings were a potential risk if the

32

Bankruptcy Court eliminated the lien in Chapter 13 but claimed that Chapter 7 filings did not bar

PPR from pursuing its collection process.

> In Chapter 7 bankruptcy, when the process is complete, the lien stays but the note
> is gone. This makes the borrower no longer financially responsible for the debt,
> BUT you the investor can still pursue the property through the mortgage.  So now
> it is not the borrower's debt, <u>it is the house's debt BUT if the borrower wants to
> stay in the house then they will have to pay off the debt. Once you know this, you
> can then go back and start the foreclosure process; and if the borrower wants to
> stay in the property you're one step closer to a workout.</u>

58.     Not only was PPR aware of the general principle that it violated the Bankruptcy

Code to attempt to collect discharged debts as a personal liability, its attorney, Diamond,

acknowledged as much in a pleading filed in the Montgomery Country Circuit Court on July 24,

2013, stating that the Bankruptcy Code precluded PPR from seeking payment from Mejia

personally.  Within days after that pleading was filed, however, PPR sent Mejia a letter stating

that she "had received a call from a third party who stated that you were interested in staying in

your home and working something out regarding your second mortgage" and a proposed

agreement stating that "under the limited circumstances contained herein PPR has agreed to

change the term of the note."   Bankruptcy judges do not usually receive guns as evidence, much

less smoking ones, but that is exactly what these communications are.

**F.     Mejia Will Ask the Court to Extinguish Respondents' Alleged Security Interest in Mejia's Residence.**

59.     While the Debtor's most immediate goal is to obtain a ruling from this Court that

PPR's foreclosure on her home and attempts to evict her violate Section 524(a), that will not

fully compensate Mejia because she has no assurance that PPR, having willfully violated the

statutory injunction against collection of a discharged debt as a personal liability, would not be

equally willing to violate an order of this Court.  The only way to provide complete relief,

se

therefore, is to extinguish the security interest that PPR claims in Mejia's residence, and Section 105(a) is broad enough to encompass such relief.

### IV.    RELIEF REQUESTED

60.    Mejia asks the Court for the following relief: (a) a judgment that PPR is in contempt under Section 524(a) of the Bankruptcy Court; (b) a judgment that the foreclosure on Mejia's residence violated Section 524(a) of the Bankruptcy Court and, thus, was invalid under Federal law; (c) an order that PPR reconvey title to the property to Mejia; (d) a judgment that PPR does not have a valid security interest in Mejia's residence or alternatively, an order extinguishing that interest based on PPR's violation of Section 524(a) of the Bankruptcy Court; (e) an injunction against any further attempts by PPR or its employees, agents, attorneys or assign to collect on the promissory note whether *in personam* or *in rem*; (f) an award of compensatory damages caused by PPR's unlawful conduct as proven at hearing, including damages for emotional distress and physical injuries suffered by Mejia; (g) an award of attorneys' fees and costs; (h) an award of punitive damages in an amount determined by the Court following hearing; and (i) such other and further relief as the court finds just and appropriate.

Dated: August 27, 2013.

/s/ Tom A. Jerman_____
Tom A. Jerman (MD Bar #13660)
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C. 20001
(202) 879-3939

Counsel for Debtor Maria L. Mejia