

THOMAS J. CATLIOTA
U.S. BANKRUPTCY JUDGE

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF MARYLAND
## at Greenbelt

| | | |
|---|---|---|
| In re: | * | Case No.   12-12090-TJC |
| Maria L. Mejia | * | Chapter   7 |
| Debtor | * | |
| * * * * * * * * | * | |
| Maria L. Mejia | * | |
| Plaintiff | * | |
| vs. | * | Adversary No.   13-00501 |
| Partners for Payment Relief LLC, *et al.* | * | |
| Defendants | * | |
| * * * * * * * * * * * * * * | | |

## MEMORANDUM OF DECISION

Plaintiff and debtor Maria L. Mejia filed this adversary proceeding against defendants Partners for Payment Relief LLC ("PPR") and Partners for Payment Relief DE III LLC ("DE III") alleging violations of the discharge injunction under 11 U.S.C. §524(a).  Specifically, plaintiff alleges that defendants engaged in a series of actions intended to coerce plaintiff into paying her discharged loan.  The parties have filed cross-motions for summary judgment as to liability only.  For the reasons in this memorandum, the court concludes that DE III violated the discharge injunction by requiring plaintiff to reaffirm and reinstate the discharged loan as a

1

condition for her to remain in her home after DE III foreclosed, but before it took possession. The court therefore will grant summary judgment to plaintiff on that issue. The court will deny the remaining relief requested by plaintiff and deny defendants' cross-motion for summary judgment.

The court has jurisdiction over this matter under 28 U.S.C. §§1334 and 157(b) and Local Rule 402 of the United States District Court of the District of Maryland. The court may enter a final judgment in this matter under 28 U.S.C. §157(b)(2) and the standards of *Stern v. Marshall*, 564 U.S. 462 (2011).

## Statement of Material Facts Not In Dispute

Plaintiff immigrated to the United States from El Salvador in 1985, and she is a lawful resident of the United States. At all pertinent times, she was self-employed as a housekeeper. She speaks a limited amount of English and cannot read or write in English, although she has friends or relatives who read and translate important documents to her.

In September 2005, plaintiff purchased her home at 262 W. Deer Park Road, Gaithersburg, Maryland (the "Property") for $284,000. She used savings of $28,000 and financed the remainder with first and second deed of trust loans. The first deed of trust loan was made by Countrywide Home Loans. The second deed of trust loan, which is the loan at issue here, was made by Intervale Mortgage Corporation in the amount of $49,650.

DE III acquired the second deed of trust loan on or about October 12, 2011. ECF 82-4 at 3 of 15. At that time the loan had an outstanding balance of $48,912.12 and DE III purchased it for $2,880.92. ECF 82-4 at 13 of 15.

Defendants are in the business of purchasing non-performing deed of trust notes at a discount from financial institutions and attempting to turn them into performing notes.

Defendants do not want to foreclose on the real property that secures the loan.  Instead, they seek to have the defaulting homeowners pay the mortgage loan.  Defendants' employees will communicate with the homeowner through mail, telephone, and with a "door knock service," in which a private investigator goes to the home.  If the defaulting homeowners refuse to respond or negotiate a payment plan with defendants, they use the foreclosure and eviction process in an effort to get the homeowners to start paying on the note.  The principal for defendants has stated:

> Sometimes it just takes the reality of a foreclosure notice to get someone to engage with one of our workout specialists. Now, do we ever actually foreclose? Yes, but not that often. It varies from trade to trade, but on average we only initiate foreclosure on about 50% of all the loans we buy, and of that 50% we only foreclose on less than 10%. Above all we use legal as a tool for getting through to the borrower, and at the end of the day, everything we do is focused on keeping someone in his or her home. We find that these favorable workouts are what create the most profit on our end . . . .

ECF 84-6 at 5 of 12.  Defendants teach their investors that the purpose is not to own the property, but to make the homeowners start paying on the note.

> [T]he 'shock and awe' impact of this quickly executed series of touches with the borrower shows a sense of urgency that their situation has escalated to a level of seriousness that they are going to have to address or foreclosure WILL be inevitable. If I were to send a letter one month, make a phone call next month, it just wouldn't have the same impact. If you don't reach the borrower or you have but you don't know their intention because they do not understand the gravity of the situation, THEY WON'T EVER PAY YOU!

ECF 84-3 at 15 of 18 ("Nothing's Happening, Now What?" Jan. 26, 2013).

Ms. Kathleen Dougherty was a workout specialist for PPR[1] and she attempted to contact plaintiff from October 2011 through December 2012 to review debt repayment options.  After plaintiff defaulted on the second deed of trust loan, DE III issued a Notice of Intent to Foreclose on January 20, 2012.

---

[1] *See* ECF 84-19, Dougherty Dep. at 17:22-25, 19:1-19, 23:1-10.

Plaintiff filed her bankruptcy petition under Chapter 7 on February 8, 2012. She received a discharge on May 16, 2012. Her schedules listed the value of the Property to be $183,600. Case No. 12-12090 at ECF 1 at 8 of 35. She listed the amount of the first deed of trust to be $261,254, held or serviced by BAC Home Loans Servicing, LP, and the amount of the second deed of trust to be $48,912, held by DE III. *Id*. at 13 of 35. DE III received notice of the bankruptcy case and notice of plaintiff's discharge.

In December 2012, DE III renewed foreclosure proceedings against the Property. On December 19, 2012, DE III filed an order to docket and further notice of intent to foreclose with the Circuit Court for Montgomery County, Maryland. On February 11, 2013, Cindy R. Diamond, on behalf of DE III,[2] sent plaintiff a notice by certified mail of a foreclosure sale scheduled for February 27, 2013. At the bottom of the letter, it stated in bold:

> **PLEASE BE ADVISED THAT THIS IS AN ATTEMPT TO COLLECT A DEBT. ANY INFORMATION OBTAINED WILL BE USED FOR THAT PURPOSE.**

ECF 82-10 at 2 of 3**.**

The foreclosure sale occurred on February 27, 2013, and DE III purchased the Property for $19,000, subject to the first deed of trust lien. The deadline for filing exceptions to the sale was April 17, 2013, and plaintiff did not file any exceptions. The Circuit Court ratified the sale on April 22, 2013.

Defendants do not dispute that the value of the Property and the amount of the first deed of trust loan at the time of the foreclosure sale were more or less the amounts stated by plaintiff in her bankruptcy schedules, as described above. Accordingly, at the time of the foreclosure

---

[2] DE III identifies Ms. Diamond as its counsel. ECF 82-1 at 4. She also served as the substitute trustee under the deed of trust.

sale, the amount outstanding on the first deed of trust loan was substantially greater than the value of the Property.

On May 6, 2013, DE III filed a motion seeking possession of the Property. The Circuit Court entered a judgment of possession in favor of DE III on June 24, 2013. On July 2, 2013, a notice of eviction was sent to plaintiff, and she was served an order of eviction by a Montgomery County sheriff on July 20, 2013.

On July 22, 2013, plaintiff, with the assistance of a friend, filed an emergency motion to stay the eviction and set aside the foreclosure. The motion was denied. On or about July 24, 2013, plaintiff called Ms. Diamond in an effort to understand why she was being evicted, and whether anything could be done to stop the eviction. Ms. Diamond described the conversation as follows:

> I personally received a phone call from Ms. Mejia asking what could be done to stop the eviction. Not just merely I'm concerned, I want to stay on the property, asking me what could be done to allow her to stay in the property. And I advised her she needed to speak with Partners for Payment Relief, I gave her the phone number. And I told her to speak with Barbara Fast [sic] at Partners for Payment Relief.

ECF 84-18, Diamond Dep. at 22:24-23:6; *see id.* at 117:9-12, 118:6-11.

As a follow up, Ms. Barbara Faust, a workout specialist for defendants, sent plaintiff a hand-written note on July 25, 2013. As relevant here, the note stated:

> Hi Maria,
>
> My name is Barb and I was recently assigned to your loan. Earlier in the week, I received a call from a third party who stated that you were interested in staying in your home and working something out regarding your second mortgage.
> If you are interested in speaking with me about this, please give me a call. I can be reached at extension 106. I look forward to speaking with you soon.

ECF 84-20 at 21 of 21; *see id.*, Faust Dep. at 53:3-14.

5

Plaintiff contacted Ms. Faust or another employee, who recognized that plaintiff did not speak English well and asked plaintiff if she would prefer to speak to someone in Spanish. *Id.* at 57:19-58:3. Plaintiff said she would. *Id.* As a result, on or about July 29, 2013, Ms. Patricia Cruz Gonzalez, a workout specialist employed by PPR and native Spanish speaker, called plaintiff explaining in Spanish that the eviction process would cease if plaintiff would agree to pay $3,000 to PPR immediately and $471.25 per month over thirty years. *See* ECF 84-21, Gonzalez Dep. at 42:17-43:22, and ECF 84-21 at 18-21 of 27. Ms. Gonzalez concluded from her call that plaintiff would be willing to sign an agreement to pay the debt. *Id.,* Gonzalez Dep. at 42:7-21. Consequently, on July 30, 2013, DE III sent plaintiff, by U.S. Express Mail, a proposed agreement (the "Agreement"). *Id.* at 18-21 of 27. The Agreement was written in English, but Ms. Gonzalez included a hand-written note in Spanish asking plaintiff to sign the agreement, have it notarized, and return it with a copy of her driver's license. *Id.*, and Gonzalez Dep. at 44:4-15. The Agreement stated:

> WHEREAS, your loan account with Partners for Payment Relief DE III, LLC ("PPR") was delinquent; and
>
> WHEREAS, as a result of the delinquency PPR initiated an action in mortgage foreclosure resulting in the Sheriffs, Marshall's or Trustee's sale of the real property located at 262 W Deer Park Road 30-F, Gaithersburg, MD 20877; and
>
> WHEREAS, PPR is now the current record owner of the Property by virtue of issuance of a deed to it; and
>
> WHEREAS, Borrower is the occupant of the Property; and
>
> WHEREAS, Borrower has requested that PPR work with Borrower to reinstate any delinquency by changing the existing term of the Note (your previously executed home loan obligation, and, if applicable, the security agreement that provides for the collateral for such obligation, and hereinafter collectively referred to in this letter agreement as your "Note") or previous modification agreement-which this letter supersedes; and

6

WHEREAS, under the limited circumstances contained herein, PPR has agreed to change the term of the Note; and

WHEREAS, Borrower agrees to strict compliance with all the terms and conditions herein, including that time is of the essence under each and every term contained in this Agreement; and

WHEREAS, Borrower recognizes that is under no such obligation, legal or otherwise, to enter into this Agreement with Borrower, and that is doing so out of good will to its Borrower; and

WHEREAS, Borrower acknowledges having read all the terms and conditions of this Agreement, and agreeing to the terms set forth herein.

NOW THEREFORE, in consideration of the foregoing, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound, the Parties hereby agree as set forth:

1. The Recitals set forth above are incorporated herein and made a part of this Agreement.

2. Borrower acknowledges that he/she/they defaulted under the terms of the Note and, if applicable the security instrument, and PPR has concluded a foreclosure and is now the owner of the Property. Borrower hereby waives any claims or defenses to the foreclosure it has or may have had in consideration of PPR's agreement to enter into this Agreement.

3. Borrower hereby agrees to the payment plan set forth below:
\* \* \* \* \*
4. Borrower agrees to make an arrears payment of $3,000.00 due **on or before August 15, 2013** made via cashier's check or money order. . . .

5. **Additional Payment Terms**: Borrower agrees that the first payment of $471.25 is due **on or before September 1st, 2013.** The first *'New Monthly Payment'* is to be applied to the *'New Principal BAL'* of $78,600.00 – the *'Past Due Interest'* will be re-set to $0. All payments will be made via ACH withdraw each month consecutively until this Agreement is paid in full. Note: ACH withdraw to be performed on/about the 1st of each month starting September 1st, 2013.

6. This Agreement will ***NOT*** be processed and will not be deemed accepted by PPR unless all of the items of the checklist below are ***completed and returned on or before August 15, 2013.*** Borrower is advised to call PPR with any questions. Failure to meet the terms and time lines listed in this Agreement may be grounds for voiding this Agreement, which decision shall be solely at PPR's discretion. The grace period and the late fee remain the same, as stated in the Note and Security Deed. The $500.00 modification fee for this Agreement will be waived if all payments are made in full and on time.

7. **Failure to Make Payments as Required**. Borrower acknowledges that if he/she/they fail to make the monthly payments required by the Note and by this Agreement, PPR, as the current record owner of the Property, or its successors and/or assigns, may take such action as it deems appropriate to take possession of the Property, or to enforce any and all other rights then existing under the terms of the Note or Security Deed.

8. **Insurance, Senior Liens and Taxes**. Borrower agrees that PPR, its successors and/or assigns, must be listed as additional insured on the Property until the terms of this Agreement or the applicable Note is completely satisfied. Borrower Further agrees that he/she/they must remain current on the payments due and owing on any senior mortgage lien to the Property, and that a default in any payment thereunder shall constitute an event of default under this Agreement. Borrower also agrees to pay any applicable property taxes due and owing on the Property.

9. **Re-conveyance**. If all the payments are made in full and on time for a period of Eighteen (18) consecutive months, PPR will issue to Borrower an original deed re-conveying the Property back to Borrower. The loan will be marked as satisfied after the last payment is made (includes Balloon if applicable). There is no prepayment penalty. Recording costs of the re-conveyance deed shall be borne by the Borrower, and PPR shall be under no obligation to either record the deed, pay any recording fees or pay any applicable transfer taxes, all of which Borrower acknowledges the responsibility to pay.

10.     [Condition of the Property]
11.     [Notices]
12.     [Severability]

8

> By signing below, Borrower acknowledges and agrees that Borrower has fully read this Agreement, agrees with all of the terms stated herein, and that this Agreement to extend the term(s) of the Note is acceptable.
>
> Please sign, date, have notarized this original and return to:
>
> Partners for Payment Relief DE Ill LLC,
> West Chester Pike Suite 103, Newtown Square, PA, 19073

ECF 82-20 at 1-3; ECF 84-21 at 18-21 of 27. There is no evidence before the court that plaintiff signed the Agreement.

On August 20, 2013, plaintiff, through counsel, filed a motion to reopen the Chapter 7 proceedings and for contempt sanctions, as well as an emergency motion for a temporary restraining order enjoining plaintiff's eviction. Case No. 12-12090 at ECF 21, 22. On August 22, 2013, the court granted the motion to reopen (*id.* at ECF 28), and on August 23, 2013, the court issued a temporary restraining order enjoining defendants from evicting plaintiff, taking any additional action to foreclose upon her home, or making any additional efforts to collect upon the underlying note. *Id.* at ECF 33. DE III subsequently re-conveyed the Property back to plaintiff.

## Conclusions of Law

Plaintiff contends that the Property had no value to defendants because the first deed of trust loan exceeded the Property's value by some 50 percent. She contends that defendants' actions in initiating and completing foreclosure on the Property, seeking to evict her, and requiring her to reaffirm the debt were an attempt to coerce her into paying the discharged loan as a personal liability. She argues this improper use of defendants' foreclosure and eviction rights violates 11 U.S.C §524(a). [3]

---

[3] Unless otherwise noted, all statutory references are to the Bankruptcy Code, 11 U.S.C. §101 *et seq.*, as currently in effect.

Federal Rule of Bankruptcy Procedure 7056 provides that Federal Rule of Civil Procedure 56 is applicable in bankruptcy adversary proceedings. Fed. R. Bankr. P. 7056. Rule 56 provides that summary judgment is appropriate if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A genuine issue is one in which the evidence is such that a reasonable factfinder could return a verdict for the nonmoving party. *See Libertarian Party of Va. v. Judd,* 718 F.3d 308, 313 (4th Cir. 2013); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "A fact is material if it might affect the outcome of the suit under the governing law." *Libertarian Party of Va.*, 718 F.3d at 313 (citation and internal quotation marks omitted). In evaluating a summary judgment motion, a court "must consider whether a reasonable jury could find in favor of the non-moving party, taking all inferences to be drawn from the underlying facts in the light most favorable to the non-movant." *In re Apex Express Corp.*, 190 F.3d 624, 633 (4th Cir. 1999). In doing so, a court is not entitled to either weigh the evidence or make credibility determinations. *See Anderson*, 477 U.S. at 255 ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge."). If the moving party is unable to demonstrate the absence of any genuine issue of material fact, summary judgment is not proper and must be denied. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Honor v. Booz-Allen & Hamilton, Inc.* 383 F.3d 180, 185 (4th Cir. 2004).

Plaintiff's claims implicate two related provisions §524(a) and §524(c). The court will address each, beginning with §524(c).

*Section 524(c).*

Section 524(c) renders unenforceable "an agreement between a holder of a claim and the debtor, the consideration for which, in whole or in part, is based on a debt that is dischargeable in the case," unless certain procedures are followed and disclosures are made. §524(c).

> Subsections (c) and (d) of section 524 prohibit enforcement of the reaffirmation of a discharged debt unless specific requirements have been met. If an agreement to pay a discharged or dischargeable debt does not meet the requirements of subsections (c) and (d), it is without legal effect. These subsections grew out of a long history of coercive and deceptive actions by creditors to secure reaffirmation of discharged debts. The subsections have been applied strictly by the courts to carry out their remedial purposes and to ensure that they are not evaded by agreements which, though not labeled as reaffirmations, have the effect of waiving the protections of the discharge. The debtor cannot enter into a postpetition agreement, other than a valid reaffirmation agreement, that would create personal liability for the discharged debt. For example, a postdischarge agreement to pay a secured debt after bankruptcy in exchange for the creditor's forbearance in repossessing the collateral is an agreement that recreates the debtor's personal liability for the debt and is not valid notwithstanding the creditor's claim that the agreement is for the "new" consideration of the creditor's forbearance.

4 Collier on Bankruptcy ¶524.04 (Alan N. Resnick & Henry J. Sommer eds., 16th ed.) (citations omitted).

Although plaintiff did not sign the Agreement, in determining its meaning the court is guided by well-established principles governing the interpretation of documents under Maryland law. The interpretation of a contract, including the determination of whether it is ambiguous, is a question of law. *Washington Metro. Area Transit Auth. v. Potomac Inv. Properties, Inc.*, 476 F.3d 231, 234-35 (4th Cir. 2007) (quoting *Gresham v. Lumbermen's Mut. Cas. Co.*, 404 F.3d 253, 260 (4th Cir. 2005)). "A contract is ambiguous if it is subject to more than one interpretation when read by a reasonably prudent person." *Sy-Lene of Washington v. Starwood Urban Retail II, LLC*, 829 A.2d 540, 547 (Md. 2003). "In determining whether a writing is ambiguous, Maryland has long adhered to the law of the objective interpretation of contracts."

11

*Calomiris v. Woods*, 727 A.2d 358, 363 (Md. 1999) (citing *State v. Attman/Glazer,* 594 A.2d 138, 144 (Md. 1991); *Cloverland, Inc. v. Fry,* 587 A.2d 527, 530 (Md. 1991); *Feick v. Thrutchley,* 586 A.2d 3, 4 (Md. 1991); *General Motors Acceptance v. Daniels,* 492 A.2d 1306, 1310 (Md. 1985); *Orkin v. Jacobson,* 332 A.2d 901, 903 (Md. 1975); *Kasten Constr. v. Rod Enterprises,* 301 A.2d 12, 17-18 (Md. 1973)).  Under the objective view, a written contract is ambiguous if, when read by a reasonably prudent person, it is susceptible of more than one meaning.  *Heat & Power Corp. v. Air Products & Chemicals, Inc.,* 578 A.2d 1202, 1208 (Md. 1990) (citing *Truck Ins. Exch. v. Marks Rentals,* 418 A.2d 1187, 1190 (Md. 1980)).  The determination of whether language is susceptible of more than one meaning includes a consideration of "the character of the contract, its purpose, and the facts and circumstances of the parties at the time of execution."  *Pacific Indem. v. Interstate Fire & Cas.,* 488 A.2d 486, 488 (Md. 1985).

>  Therefore, when interpreting a contract the court's task is to:
>
>> determine from the language of the agreement itself what a reasonable person in the position of the parties would have meant at the time it was effectuated. In addition, when the language of the contract is plain and unambiguous there is no room for construction, and a court must presume that the parties meant what they expressed. In these circumstances, the true test of what is meant is not what the parties to the contract intended it to mean, but what a reasonable person in the position of the parties would have thought it meant. Consequently, the clear and unambiguous language of an agreement will not give away to what the parties thought that the agreement meant or intended it to mean.

*General Motors Acceptance,* 492 A.2d at 1310.  Further, the Fourth Circuit has explained how these standards are to be applied on summary judgment:

> A court faces a conceptually difficult task in deciding whether to grant summary judgment on a matter of contract interpretation. Only an unambiguous writing justifies summary judgment without resort to extrinsic evidence, and no writing is unambiguous if susceptible to two reasonable interpretations. The first step for a court asked to grant summary judgment based on a contract's interpretation is, therefore, to determine whether, as a

12

> matter of law, the contract is ambiguous or unambiguous on its face. If a court properly determines that the contract is unambiguous on the dispositive issue, it may then properly interpret the contract as a matter of law and grant summary judgment because no interpretive facts are in genuine issue. Even where a court, however, determines as a matter of law that the contract is ambiguous, it may yet examine evidence extrinsic to the contract that is included in the summary judgment materials, and, if the evidence is, as a matter of law, dispositive of the interpretative issue, grant summary judgment on that basis. If, however, resort to extrinsic evidence in the summary judgment materials leaves genuine issues of fact respecting the contract's proper interpretation, summary judgment must of course be refused and interpretation left to the trier of fact.

*Goodman v. Resolution Trust Corp.*, 7 F.3d 1123, 1126 (4th Cir.1993) (quoting *World-Wide Rights Ltd. P'ship v. Combe Inc.*, 955 F.2d 242, 245 (4th Cir. 1992)) (internal citations and quotations marks omitted). "Therefore, summary judgment is appropriate when the contract in question is unambiguous or when an ambiguity can be definitively resolved by reference to extrinsic evidence." *Washington Metro. Area Transit Auth.*, 476 F.3d at 235.

The unambiguous language of the Agreement establishes that it was an effort by DE III to have plaintiff reaffirm the discharged debt. Under the Agreement, the term "Note" means the "previously executed home loan obligation and, if applicable, the security agreement that provides for the collateral for such obligation . . . ." ECF 82-20 at 1. The Agreement provides that "[DE III] has agreed to change the term of the Note." *Id*. Thus, by its terms, the Agreement purports to modify the obligation that was discharged in plaintiff's bankruptcy case.

The Agreement further provides that plaintiff is required to make the payments required "by the Note and by this Agreement." *Id*. at ¶7. If plaintiff fails to do so, DE III "may take such actions as it deems appropriate . . . [including] to enforce any and all other rights then existing under the terms of the Note . . . ." *Id*. These provisions revive the terms of the discharged note and allow DE III to enforce those terms. The Agreement also requires plaintiff to make an

"arrears payment" of $3,000. *Id* at ¶4. By requiring plaintiff to pay the arrears on the discharged note, it is apparent that the Agreement requires plaintiff to pay the discharged obligation.

Paragraph 3 sets forth the current due date, maturity date, payoff balance, interest rate, term, monthly payment, and unpaid principal of the discharged note. ECF 82-20 at ¶3. It also lists, among other things, the total delinquency and past due interest purportedly owed on the discharged note. *Id*. It then lists the new principal balance (after crediting the "arrears payment"), new interest rate, new term, new maturity date and new monthly payment under the Agreement. Paragraph 3 makes clear that the Agreement modifies and reinstates the discharged obligation.[4]

This conclusion is further buttressed by considering what the Agreement is not. It is not a new loan; no new money is being lent and the express terms of the Agreement state it "change[s] the term of the Note." ECF 82-20 at 1. It is not a secured loan, at least for the first 18 months of its term; plaintiff held no interest in the Property and was being asked to reaffirm an unsecured, discharged debt. It is not a lease; by its express terms, the Agreement is "not intended to create any form of Landlord - Tenant relationship." ECF 82-20 at ¶10.

Accordingly, the only reasonable interpretation of the Agreement is that "the consideration for [the Agreement] in whole or in part, is based on a debt that is dischargeable . . . ." §524(c).[5] Section 524(c), however, addresses executed reaffirmation agreements, while here, plaintiff did not sign the Agreement. The court now turns to the discharge injunction.

---

[4] The Agreement states that the "Payoff Balance" on the discharged debt is $76,145.96, while the restructured and restated amount is $78,600 plus the $3,000 arrears payment, for a total of $81,600. ECF 82-20 at ¶¶3-4. It is perhaps notable that DE III required plaintiff to pay an extra $5,454.04 above the payoff balance to remain in the Property.

[5] Section 524(c) permits the bankruptcy court to approve an agreement between a creditor and a debtor that is based on a dischargeable debt only if (1) it is executed prior to the granting of a §727 discharge; (2) the debtor receives disclosures required under §524(k); (3) the agreement is submitted to the court for approval as provided in §524(c)(3); (4) the debtor has not rescinded the agreement before the discharge or within 60 days of it being filed with the court, whichever occurs first; and (5) the agreement complies with §524(d). *See* §524(c). The Agreement between DE III and plaintiff did not comply with any part of §524(c).

*Section 524(a)(2).*

Section 524(a)(2) provides that "[a] discharge in a case under this title . . . operates as an injunction against the commencement or continuation of an action, the employment of process, or an act, to collect, recover or offset any such debt as a personal liability of the debtor." §524(a)(2). While §524(a) does not expressly provide a remedy for a violation of the statutory injunction, the federal courts have uniformly held that bankruptcy courts have authority under §105(a) to enforce §524(a) through contempt proceedings. *In re Paul*, 534 F.3d 1303, 1306-1307 (10th Cir. 2008) (citing *Walls v. Wells Fargo Bank, N.A.*, 276 F.3d 502, 506–07 (9th Cir. 2002), *Cox v. Zale Del., Inc.*, 239 F.3d 910, 916–17 (7th Cir. 2001), *Bessette v. Avco Fin. Servs., Inc.*, 230 F.3d 439, 444 (1st Cir. 2000)); *In re Nat'l Gypsum Co.*, 118 F.3d 1056, 1063 (5th Cir. 1997); *In re Hardy*, 97 F.3d 1384, 1389 (11th Cir. 1996). The parties do not dispute that plaintiff must prove that there was a violation of the discharge injunction by clear and convincing evidence. *See In re Johnston,* No. 05-06288, 2007 WL 3166941 at *5 (Bankr. N.D.W. Va. Oct. 25, 2007) (citing *Ashcraft v. Conoco, Inc.*, 218 F.3d 288, 301 (4th Cir. 2000)).

"[E]ven legitimate state-law rights exercised in a coercive manner might impinge upon the important federal interest served by the discharge injunction, which is to ensure that debtors receive a 'fresh start' and are not unfairly coerced into repaying discharged prepetition debts." *In re Pratt*, 462 F.3d 14, 19-20 (1st Cir. 2006). "Notwithstanding the facial permissibility of a lawsuit or some other action taken by a creditor vis à vis a discharged debtor, a violation of §524(a)(2) may still be found if the debtor proves the creditor acted in such a way as to coerce or harass the debtor improperly i.e., so as to obtain payment of the discharged debt." *In re Paul,* 534 F.3d at 1308. "[A] creditor acts to collect a debt if it acts or fails to act, in a coercive manner, with the sole purpose of collecting that debt." *In re Kuehn,* 563 F.3d 289, 292 (7th Cir. 2009).

"An action is coercive where it is 'tantamount to a threat,' . . . or places the debtor 'between a rock and hard place' in which he would lose either way." *In re Lumb*, 401 B.R. 6-7 (B.A.P. 1st 2009) (quoting *Jamo v. Katahdin Fed. Credit Union*, 283 F.3d 392, 402 (1st Cir. 2002); and citing *Diamond v. Premier Capital, Inc.*, 346 F.3d 224, 227-28 (1st Cir. 2003)).

"Violation of the discharge injunction does not require explicit demands for the repayment of a discharged debt." *In re Malone*, No. 10-31855, 2012 WL 162374, at *5 (Bankr. W.D.N.C. Jan. 19, 2012) (citation omitted). "[A] debtor may establish that a creditor who has taken an action not overtly prohibited by § 524(a)(2) nevertheless violated the discharge injunction" where the creditor's actions were intended to coerce the debtor into paying the debt personally. *In re Paul*, 534 F.3d at 1308. The law under §524 is well established that "[e]ven if a creditor threatens only to enforce its surviving lien, that threat will violate the discharge injunction if the evidence shows that the threat is really an effort to coerce payment of the underlying discharged debt." *See* 4 Collier on Bankruptcy ¶524.02(2)(a). In such a circumstance, "[t]he absence of any other reason for a creditor's act other than coercion is circumstantial evidence of the creditor's motives." *Id.*

Numerous cases have held that a party who exercises its *in rem* rights nonetheless violates §524(a) if *either* the purpose *or* the objective effect of the action is to coerce the debtor into paying the debt personally. *See In re Paul*, 534 F.3d at 1308–09 (finding that an ostensible attempt to collect debt *in rem* violates §524(a) where actions had no objective purpose except to coerce debtor to pay debt personally); *In re Pratt*, 462 F.3d at 19.[6]

---

[6] To hold a creditor in contempt for violating §524(a), the court must conclude that the violation was "willful". Courts define "willful" to mean that (1) the creditor knew that the debt in question had been discharged in bankruptcy; and (2) the creditor intended the actions that violated the discharge injunction. *See, e.g., In re Zilog, Inc.*, 450 F.3d 996, 1007 (9th Cir. 2006) (quoting *In re Bennett*, 298 F.3d 1059, 1069 (9th Cir. 2002)) (internal quotation marks omitted) ("movant must prove that the creditor (1) knew the discharge injunction was applicable; and (2) intended the actions which violated the injunction"); *In re Hardy*, 97 F.3d at 1390 (the court will find the defendant in contempt if it: "(1) knew that the [discharge injunction] was invoked and (2) intended the actions which violated

16

Under the uncontroverted facts, DE III violated the discharge injunction. No clearer evidence of this is needed than the Agreement. The court concluded above that the Agreement was an improper attempt to reaffirm the discharged debt. DE III required plaintiff to reaffirm the discharged debt in exchange for remaining in the Property. In doing so, DE III sought to recover the discharged debt, which was "an act[] to collect [or] recover" the discharged debt "as a personal liability of the debtor." §524(a)(2).

At the time DE III sent the Agreement to plaintiff, DE III had already fully exercised its *in rem* rights under the deed of trust and owned it. The existing note was discharged and unenforceable, and DE III held no *in personam* rights against plaintiff. Defendants argue that once DE III foreclosed on the Property, it was free to enter into any agreement it saw fit with plaintiff. This court disagrees. DE III's actions were constrained by §524(a), which prohibited DE III from engaging in any act to collect or recover the discharged debt. That is what DE III did.

DE III characterizes the Agreement as a sale of the Property. To be sure, under its terms, if plaintiff timely performed her obligations for the first 18 months, the Property would be transferred to her. The court concluded above, however, that the Agreement was a restructure and reaffirmation of the discharged loan, initially as an unsecured loan and later as a secured loan. DE III purchased the Property at foreclosure subject to the first deed of trust loan. The uncontroverted record establishes that at that time, the Property was worth much less than the first deed of trust loan against it. The interest DE III acquired through foreclosure had no present economic value as real estate, and had whatever leverage value DE III could extract from plaintiff. DE III sought to "sell" that interest to the debtor for $81,600, consisting of the $78,600

---

the [discharge injunction]"); *In re Tucker*, 526 B.R. 616 (Bankr. W.D. Va. Feb. 27, 2015) ("'[t]o constitute a willful act, the creditor . . . must only commit an intentional act with knowledge of the [discharge injunction]'"). There is no question here that DE III knew of the discharge and intended the acts attributed to it.

17

restructured, previously discharged note plus the $3,000 arrears payment. ECF 82-20 at ¶¶3-4. Characterizing the Agreement merely as a sale ignores its unambiguous terms, addressed at length above, and the uncontroverted facts. No reasonable factfinder could conclude that the "sale" was not a restructure and restatement of the discharged debt.

Plaintiff argues that amount DE III sought from plaintiff under the Agreement, $81,600, for the interest held by DE III is unconscionable, especially considering DE III paid less than $3,000 for the debt and that the Agreement required plaintiff to stay current on the first deed of trust loan.[7] *See supra* n.4. The court need not address that issue. Having fully exercised its *in rem* rights under the deed of trust, and holding no *in personam* rights against the debtor, DE III sought to "sell" the foreclosed interest by having plaintiff reaffirm a discharged debt. It therefore sought to recover the discharged debt in violation of §524(a)(2).

Plaintiff further asserts that all of the actions defendants took after plaintiff received her discharge were intended to coerce plaintiff into paying the discharged debt. Plaintiff therefore argues that defendants repeatedly violated the discharge injunction through a series of actions, including calls and letters to plaintiff, foreclosing, and seeking to evict plaintiff after foreclosure. Plaintiff argues that defendants' business practice is to purchase worthless second mortgage notes for cents on the dollar, as they did here, and then use available remedies to coerce debtors to repay the discharged debt. Plaintiff argues that because the purpose and objective of these actions was to coerce plaintiff into paying the debt personally, each such action was a violation of the discharge injunction.

---

[7] "An unconscionable bargain or contract has been defined as one characterized by 'extreme unfairness,' which is made evident by '(1) one party's lack of meaningful choice, and (2) contractual terms that unreasonably favor the other party.'" *Walther v. Sovereign Bank*, 872 A.2d 735, 743-744 (Md. 2005) (citing *Black's Law Dictionary* 1560 (8th ed. 2004)).

These broader claims of violating the discharge injunction are not susceptible of resolution on summary judgment. Although the court can infer defendants' purpose and objectives from general statements of their business practices, the determination of defendants' purpose and objectives for contacting plaintiff, conducting the foreclosure sale, and initiating eviction proceedings *in this case* requires resolution of facts, and perhaps credibility determinations of witnesses, that cannot be resolved here.[8] The court, however, can grant summary judgment on the ground that DE III violated the discharge injunction by requiring that plaintiff sign the Agreement to stay in the Property, thereby reaffirming the discharged debt, because its terms are plain and unambiguous.

Defendants' primary defense is to argue that the deed of trust lien rode through plaintiff's bankruptcy case and DE III had the legal right to foreclose. Plaintiff does not dispute this, and it certainly is true. But that legal right provides no defense under these circumstances. "[E]ven legitimate state-law rights exercised in a coercive manner might impinge upon the important federal interest served by the discharge injunction, which is to ensure that debtors receive a 'fresh start' and are not unfairly coerced into repaying discharged prepetition debts." *In re Pratt*, 462 F.3d at 19-20.

Defendants also contend that the ratification of the foreclosure bars plaintiff from asserting that they violated the discharge injunction under the doctrine of res judicata. This court disagrees. Res judicata cannot bar a claim that arose after the foreclosure sale, and DE III's

---

[8] For this reason, the court cannot grant either plaintiff's or PPR's motion for summary judgment on PPR's liability in this case. Moreover, plaintiff has filed a motion to amend the complaint by adding PPR Note Co., LLC, Dave Van Horn, John Sweeney, Robert Paulus and Ms. Diamond as defendants. ECF 80. The motion was filed at the same time as the parties filed their motions for summary judgment, and the court determined to resolve the motion for summary judgment before resolving the motion to amend the complaint. The motion to amend the complaint will be set for hearing.

requirement that plaintiff reaffirm the discharged debt to remain in the Property arose after the foreclosure sale.

Finally, defendants state they faced a "Hobson's Choice" once they foreclosed, arguing that because any action they took would be said to violate the discharge injunction, they would be unable to take any action at all. The court disagrees. Defendants could have taken any number of actions under the circumstances–other than requiring plaintiff to reaffirm an unsecured debt of $81,600 for an economically worthless interest–that would not have violated §524(a).

## Conclusion

For the foregoing reasons, the court concludes that DE III violated the discharge injunction by requiring plaintiff to reaffirm the discharged debt in order to remain in the Property. The court therefore grants partial summary judgment to plaintiff. The court denies the remaining relief sought by plaintiff in the motion and denies defendants' motion for summary judgment and will set the matter for trial. A separate order will follow.

cc:   all parties
      all counsel

**END OF MEMORANDUM**